## GOLDSTEIN ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 36, September Term, 1974.]

*Decided November 13, 1974.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Harry Adelberg*, with whom was *Harvey B. Steinman* on the brief, for appellants.

*Richard K. Jacobsen, Assistant City Solicitor*, with whom were *Benjamin L. Brown, City Solicitor*, and *Harry S. Swartzwelder, Jr., Assistant City Solicitor*, on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

The appellants Miriam H. Goldstein and Irving L. Goldstein, as tenants by the entirety, on the one hand, and the appellants Betty Lee Hoffman and Sidney Hoffman, as tenants by the entirety, on the other, each own an undivided one-half interest in a tract of 1.99 acres located on what until 1964 was Russell Street, in an industrial area of Baltimore. For purposes of this opinion, the Goldsteins and the Hoffmans will be referred to collectively as the Owners.

In 1964, construction of the Russell Street Viaduct Extension (the Viaduct), which was built to link the Baltimore-Washington Parkway to downtown Baltimore with a limited access highway, was completed. In April, 1966, contending that the construction of the Viaduct had deprived them of all reasonable access to their property, the Owners sued the Mayor and City Council of Baltimore (the City) in the Baltimore City Court. In the first count, the Owners sought to recover damages of $200,000.00; in the second, Irving L. Goldstein and Sidney Hoffman, co-partners trading as Schreiber Truck Parts Company, the occupant of the tract, sought to recover $100,000.00.

For reasons not made entirely clear by the record, the case did not come on for trial until October, 1973,[1] when it was heard by Judge Basil A. Thomas, without the aid of a jury. At the close of the case, the City's motion to dismiss was held sub curia. In February, 1974, judgment was entered against the Owners and in favor of the City for costs.

The Owners appealed to the Court of Special Appeals. We granted certiorari in order that the case might be docketed in this Court.

It seems that prior to the construction of the Viaduct, the Owners' property had a 465 foot frontage on, and full access to, Russell Street, a busy thoroughfare with a 100 foot right of way, paved to a width of 84 feet. The Viaduct was located on an embankment approximately 50 feet above the street level of old Russell Street and encroached on more than half of the 100 foot right of way. For the Owners' full access to old Russell Street there were substituted several service roads, laid out under the Viaduct. The tract still fronts on one of these roads, the bed of old Russell Street paved to a width of about 30 feet.

The Owners contend that the circuitous access to and egress from the property made it difficult for regular customers to find the site; that the location was no longer visible from the Viaduct, as it had been from old Russell Street, so that transient trade ceased; that as a result, business fell off drastically, with the consequence that it became necessary to move the truck parts business to a new location. Even prior to the relocation a tenant which had leased for $3,600.00 a year a portion of the property and had built a gasoline filling station surrendered its lease a year before the end of the initial 10-year term because of the diversion of traffic from the site and the loss of its customers.

At time of trial, the tract was leased to two tenants at a combined monthly rental of $300.00. Philip E. Klein, who

---

1. At argument, the delay was attributed to the City's trial strategy. An examination of the docket for the years 1966-1973 discloses an impressive array of demurrers, interrogatories, exceptions and motions.

qualified as an expert real estate appraiser, was produced as a witness for the Owners. It was his opinion that prior to the construction of the Viaduct, the property and improvements had a fair market value of $143,550.00, and a value of $36,600.00 after the completion, a difference of $106,950.00.

Mr. Klein explained that in his opinion, the highest and best use of the tract originally was for business roadside use. After the completion of the Viaduct, and the diversion of traffic, the highest and best use was industrial or warehouse use, either of which commands a smaller price.

Donald G. Betz, produced as an expert real estate appraiser for the City, was of the opinion that the value of the property before the construction of the Viaduct was $102,250.00, and after its completion was $34,950.00, a difference of $67,300.00.

Judge Thomas filed an opinion in which he recognized the erosion in value and the limitation in access which had resulted from the construction of the Viaduct. It was his conclusion, however, that because the Owners had not been denied all access, they could not make out a case in damages. On appeal, the Owners counter with the argument that recovery should have been allowed because they were denied reasonable access.

A considerable amount of litigation has been generated when, in the absence of a controlling statute, existing streets have been converted into limited access highways, in such fashion that none of the land of an abutting property owner is taken, although his right of access is restricted. The cases have been collected in an elaborate Annotation, 42 A.L.R.3d 13, 30-58 (1972).

The manner in which the problems have been resolved would seem to support a conclusion that there has been little change since 1907, when the Supreme Court observed in *Sauer v. New York,* 206 U. S. 536, 548 (1907):

"The right of an owner of land abutting on public highways has been a fruitful source of litigation in the courts of all the States, and the decisions have

been conflicting, and often in the same State irreconcilable in principle. The courts have modified or overruled their own decisions, and each State has in the end fixed and limited, by legislation or judicial decision, the rights of abutting owners in accordance with its own view of the law and public policy."

*See also* 10 E. McQuillin, The Law of Municipal Corporations § 30.147, at 940-46 (3d ed. 1966 Rev. Vol.).

The Owners would have us adopt the rule which has been followed in some 20 states, that an abutting owner may recover, in the absence of statute, if his right of access has been unreasonably, substantially or materially restricted. The cases which support this proposition are collected in 42 A.L.R.3d at 30-33.

If a rule can be distilled from our decisions, however, it is this. Because Maryland Constitution Art. III, § 40 provides that compensation must be paid for private property taken for public use, and not for damage or injury to such property, in the absence of statutory relief, there ordinarily can be a recovery when access to a public street is destroyed, but not when access is simply limited or regulated, *Krebs v. State Roads Comm'n*, 160 Md. 584, [*Krebs v. Uhl,*] 154 A. 131 (1931); *Baltimore v. Baltimore Marine Works*, 152 Md. 367, [*Mayor and City Council v. Baltimore Marine Works,*] 136 A. 829 (1927); *Baltimore v. Dobler*, 140 Md. 634, 118 A. 168 (1922), *later appeal,* 151 Md. 154, [*Dobler v. Mayor and City Council,*] 134 A. 201 (1926); R. Bowie, *Limiting Highway Access*, 4 Md. L. Rev. 219 (1940). *See also State Roads Comm'n v. Jones*, 241 Md. 246, 216 A. 2d 563 (1966), the result of which was controlled by Maryland Code (1957) Art. 89B, §§ 214-215.

Nowhere is the rule better illustrated than in two cases, decided more than 50 years ago. In *Sanderson v. Baltimore*, 135 Md. 509, 109 A. 425 (1920), the plaintiff's house was built on a corner lot which fronted on two streets and an alley. The city lowered the grade of one street by 14 to 17 feet; the other, by 16 to 30 feet, cutting off both ends of the alley.

Vehicular access was entirely cut off. The only access available to individuals was by way of a steep ladder. The Court concluded that access was destroyed and that there was a compensable taking.

Two years later, in *Baltimore v. Dobler, supra,* 140 Md. 634, an unimproved lot ran the full length of the block between two parallel streets, fronting 315 feet on each. The city lowered the grade of one of the streets by 20 feet, leaving the plaintiff with access only on the other street, 466 feet distant. In denying the property owner relief, the Court quoted from *Mayor & City Council of Cumberland v. Willison,* 50 Md. 138, 147-48 (1878):

> "How far municipal corporations are liable for consequential damages to private property resulting from the exercise of their corporate powers, or what will amount to the 'taking of private property for public use' in the constitutional sense of these terms, has been the subject of much discussion and controversy. Certain general principles seem, however, to have been clearly settled by the current and weight of judicial authority. Thus it is well settled that such a corporation is not liable to an action for consequential damages to private property or persons (unless it be given by statute) where the act complained of was done by it or its officers under and pursuant to authority conferred by a valid Act of the Legislature, and there has been no want of reasonable care or skill in the execution of the power, although the same act, if done without legislative sanction, would be actionable. 2 Dillon on Mun. Corp. sec. 781. Upon this principle it has been decided by a great preponderance of authority that municipal corporations acting under authority conferred by the Legislature to make and repair, or to grade, level, and improve streets, if they exercise reasonable care and skill in the performance of the work resolved upon, are not answerable to the

adjoining owner whose lands are not actually taken, for consequential damages to his premises, even though in grading and leveling the street a portion of the adjoining lot in consequence of the removal of its natural support falls into the highway, and the same immunity exists if the street be embanked or raised so as to cut off, or render difficult the access to the adjacent property, and this, too, although the grade of the street had been before established and the adjoining property owner had erected buildings or made improvements with reference to such grade. Property *thus injured* is not in the constitutional sense *taken* for public use. This doctrine was long since announced, after the most careful consideration, by courts of the highest authority, and by Judges of great eminence and learning." (Emphasis in original.)

Mr. Goldstein testified that the use of the service roads, depending on the direction taken, increased the distance to be traveled to reach the property by .5 of a mile, .8 of a mile and 1.1 miles. That this is of no consequence under our prior decisions is best illustrated by *Brehm v. State Roads Comm'n,* 176 Md. 411, [*Brehm v. Tabler,*] 5 A. 2d 820, 6 A. 2d 378 (1939) and by *Krebs v. State Roads Comm'n, supra,* 160 Md. 584. In *Brehm,* the closing of a grade crossing and the substitution of a bridge increased the distance from the plaintiff's farm to the Philadelphia Road by about a mile. In *Krebs,* the plaintiff's store was located just to the west of a grade crossing into Parkton, where 80% of the plaintiff's customers lived. The State Roads Commission relocated the road, built an overpass farther south, and eliminated the grade crossing. As a result, the plaintiff's store, which had been only several hundred feet from Parkton by road, was now nearly a mile away. Both cases stand for the proposition that where there is no taking, there can be no recovery for the inconvenience suffered by the landowner, if access is not wholly destroyed. To the same effect is *German Lutheran Church v. Baltimore,* 123 Md. 142, 90 A. 983 (1914), where the closing at the distance of a block from the church of one

of two streets on which the church was located required members coming from the east to travel a circuitous route. *See also Turner v. State Roads Comm'n,* 213 Md. 428, 132 A. 2d 455 (1957); *Langley v. State Roads Comm'n,* 213 Md. 230, 131 A. 2d 690 (1957) dealing with the inconvenience caused by the control or diversion of traffic.

There is ample authority elsewhere for the proposition that if service or frontage roads are provided when access is denied to an existing road, there is no compensable damage, *Surety Sav. & Loan Ass'n v. State, Dept. of Trans.,* 54 Wis. 2d 438, 195 N.W.2d 464, *appeal dismissed,* 409 U. S. 810 (1972); *Bopp v. State,* 19 N.Y.2d 368, 280 N.Y.S.2d 135, 227 N.E.2d 37 (1967); *State Highway Comm'n v. Brockfeld,* 388 S.W.2d 862 (Mo. 1965), *cert. denied,* [*Mohr v. State Highway Comm'n,*] 382 U. S. 846 (1965); *Houghs v. Mackie,* 1 Mich. App. 554, 137 N.W.2d 289 (1965); *State Highway Comm'n v. Central Pav. Co.,* 240 Or. 71, 399 P. 2d 1019 (1965); *James v. State,* 88 Idaho 172, 397 P. 2d 766 (1964); *Stefan Auto Body v. State Highway Comm'n,* 21 Wis. 2d 363, 124 N.W.2d 319 (1963); *Darnall v. State,* 79 S. D. 59, 108 N.W.2d 201 (1961). *See also* Stoebuck, *The Property Right of Access Versus the Power of Eminent Domain,* 47 Tex. L. Rev. 733, 749-55 (1969); Covey, *Frontage Roads: To Compensate or Not to Compensate,* 56 N.W.U. L. Rev. 587, 592-95 (1961).

As we see it, the Owners could not have prevailed, under the rule of our cases, there being no proof that there was a want of reasonable care or skill in the making of the improvement, unless the trial judge would have been able to find that the Owners had been deprived of *all* access to the property — a finding which was not possible under the facts of the case.

*Judgment affirmed, costs to be paid by appellants.*