811 A.2d 828

## HARFORD COUNTY PEOPLE'S COUNSEL

v.

## BEL AIR REALTY ASSOCIATES LIMITED PARTNERSHIP.

No. 475, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 2, 2002.

■■■■■■■■■■■■■■■■
■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

---

Robert F. Kahoe, Jr., Bel Air, for appellant.

Michael E. Leaf (Hodes, Ulman, Pessin & Katz, P.A. on the brief), Bel Air, for appellee.

Argued before DAVIS, SALMON, and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., Judge, Ret'd, Specially Assigned.

This matter highlights the tension between the rule of law and the nebulous concept of an agency's discretion to implement the goals a statute was meant to achieve.

The Harford County People's Counsel appeals the decision of the Circuit Court for Harford County reversing a decision of the Harford County Board of Appeals (Board). In this zoning case, the Board, adopting a decision by a Zoning Hearing Examiner, rejected an interpretation of the deceptively innocuous phrase "directly accessible" by the Harford County development regulations sought by Bel Air Realty Associates Limited Partnership in connection with Bel Air's intent to develop a subdivision that qualifies for classification of "conventional with open space." For the reasons that follow, our interpretation of the phrase "directly accessible" necessitates the reversal of the judgment of the circuit court.

## INTRODUCTION

Bel Air Realty owns a 24.7 acre parcel of land ("Property") that is located in Harford County and situated just north of the town of Bel Air, near the intersection of Business U.S. Route 1, known as Conowingo Road, and the U.S. Route 1 "Bel Air" bypass. The Property lies adjacent to a development named the "Hickory Overlook" subdivision. Both properties were originally zoned "ORI" (Office, Research, Industrial). On April 18, 1995, a zoning hearing examiner reclassified

both projects from "ORI" to "R–3" (residential). Bel Air Realty, in its efforts to develop the parcel, arranged with the Hickory Overlook developer to use a main road in the latter subdivision, Overlook Way, to access Business Route 1. The northern boundary of the Property abuts the Route 1 Bypass, but frontage access to this highway was denied by the Maryland State Highway Administration. *See* Maryland Code (1977, 2001 Repl.Vol.), § 8–620(c) of the Transportation Article.

Bel Air continues to pursue development of the Property in question, and now seeks approval from the Harford County Department of Planning and Zoning to develop its Property as a "conventional with open space (COS)" subdivision under Section 267–46 of the Harford County Zoning Code.[1] Such a designation would enable it to develop the Property at a greater density than that permitted for conventional R–3 development alone.

To this end, Bel Air requested that the Department provide an "interpretation"[2] that its project satisfied the prerequisites

---

**1.** Section 267–46 reads in part as follows:

> **§ 267–46. Conventional development with open space (COS) and planned residential development (PRD).**
> A. Eligibility. A COS shall have a minimum parcel size of fifteen (15), ten (10), five (5) and five (5) acres in the R1, R2, R3 and R4 Districts, respectively.
> B. Development standards.
> (1) Permitted uses....
> (2) Density....
> (3) Site design.
> . . .
> (d) Buildings near the periphery of the project shall be harmonious with neighboring areas and shall provide adequate transition in density and type or shall provide a buffer yard as required in § 267–28C, Buffer yard requirements.
> (4) Vehicular circulation and access.
> (a) The project roads shall be designed to provide a logical road network adequate for internal movement.
> (b) The project must be directly accessible from one (1) or more existing or planned arterial or collector roads.
> Harford County Zoning Code, § 267–46.

**2.** Section 267–7B(5) of the Harford County Code authorizes the Zoning Administrator to:

for COS approval. Specifically, the Department was asked to decide whether the Property would be deemed to be "directly accessible" to Business Route 1 for purposes of satisfying the Section 267–46B(4)(b) requirement for such access. In the alternative, Bel Air sought a variance from the requirements for a COS development.

A hearing on Bel Air's application for an interpretation was convened before a Zoning Hearing Examiner on June 12, 19, and 26, 2000. On September 21, the hearing examiner issued her decision, concluding that the project was not "directly accessible" to Business Route 1, thus ruling that it would not qualify for development with COS status. Bel Air's request for a variance from the requirements of Section 267–46B(4)(b) was withdrawn at the hearing.

On December 5, 2000, the Harford County Council, sitting as the Board of Appeals, ratified and adopted the hearing examiner's decision in all respects. Bel Air filed a petition for judicial review in the Circuit Court for Harford County. Maryland Rule 7–201. *See* Harford County Code, § A274–6. On September 13, 2001, the circuit court reversed the Board's decision and remanded this matter for further proceedings. This appeal ensued.

### ISSUE

The salient and dispositive issue in this appeal is whether Bel Air's project is "directly accessible" from at least one "existing or planned arterial or collector road[ ]," *viz.* Business Route 1, as a matter of law. If the answer to this is "yes," then the circuit court correctly overturned the Board's conclusion to the contrary. Appellant People's Counsel contends that the court was wrong, and urges that we vacate the court's order and uphold the Board. In assigning error to the circuit court's decision, appellant further avers that the court

---

Render interpretations upon written request of an interested person whose property may be affected as to the applicability of this Part 1 to particular uses and its application to the factual circumstances presented.

ignored the longstanding interpretation of the Zoning Code by the Department of Planning and Zoning, the agency charged with its administration and enforcement. Bel Air Realty urges that we affirm. It challenges the administrative interpretations of the Zoning Code, and points out inconsistencies in the Department's application of this rule as one factor that undermines its validity.[3]

## PERTINENT FACTS

The parties more or less agree that this appeal raises a purely legal question. Nevertheless, being careful never to express ourselves more clearly than we are able to think, we will rehearse those facts which may be pertinent to our discussion.

Craig Ward, a consulting civil engineer and urban land planner, and qualified as an expert in these fields, testified on behalf of Bel Air Realty. He had been a consultant for the developer, and had "been involved" with this property since 1987.

In 1995, both the Hickory Overlook property and Bel Air property were reclassified from ORI to R–3. Ward recalled that the Bel Air Realty and Hickory Overlook projects had always been linked by the Department of Planning and Zoning, and testified that, at the least, the development of these two subdivisions would be coordinated.

Ward chronicled the unsuccessful attempts by developers to obtain access for the property to the U.S. Route 1 Bypass. Having failed to gain access to Route 1, Bel Air Realty's project could only reach the Route 1 alternative—the original, or "old," U.S. Route 1 known as "Business Route 1"—over Overlook Way, a 36–feet wide paved roadway through the Hickory Overlook development. Ward testified that the de-

---

**3.** One must be careful not to confuse thinking with logic. Inconsistencies by themselves are not necessarily fatal. One need only look to our Federal Constitution which not only survives but functions well despite the inconsistencies in its interpretation.

sign characteristics for a primary "residential road," such as Overlook Way, and an "arterial road" and "collector road" are the same. He further opined that Overlook Way would provide direct access between minor residential roads and collectors, thus fulfilling the "direct access" requirement of Section 267–46B(4)(b). Ward stressed that Overlook Way had been designed to provide access to the Bel Air development.[4]

Ward described three other developments in Harford County—Spenceola, Deer Spring and Woodland Run—which, he opined, have access characteristics that are similar to Bel Air Realty's property, in that they, too, are separated from qualifying roads by intervening properties. These developments have each been classified as COS. Ward explained that if the Bel Air property did not attain COS approval, it would only be developed into a community with single family detached lots—not the optimal use of this land. He stressed that the infrastructure had been planned for multi-family use.

Lee Cunningham, an expert in the fields of land use and transportation planning, agreed with Ward's assertion that Overlook Way renders the Bel Air property "directly accessible" to Business Route 1. Cunningham thought that the Code imposed no requirement that a COS development, such as that proposed by Bel Air Realty, actually abut or front on an arterial road to have direct access thereto.

Anthony McClune presented the views of the Department of Planning and Zoning. McClune, manager of the Department's Division of Land Use Management, testified that a conventional with open space development would be subject to the "Special Development design criteria within the [Zoning] Code." He emphasized that a "project" must be directly accessible from a collector or arterial road as a predicate for COS qualification. McClune stressed that this requirement

---

4. In its brief, Bel Air emphasizes that Overlook Way "meets the 1982 definition of a 'Collector Road,' " and points out that Overlook would have been classified as a collector road under the earlier standards. Regardless, Overlook Way is currently classified as a residential road, and does not constitute a collector road under the current Zoning Code.

meant that a project's access to a qualifying roadway be "immediate," and not through another existing project, such as Hickory Overlook.

McClune explained that the "direct access" requirement would prevent ingress to a high-density project, such as the COS development sought here, through a lower-density project such as Hickory Overlook:

> We believe the intention of that Section of the Code was to basically make sure that the higher density projects that have more flexibility in housing types would basically be able to be immediately accessible to the collector or arterial road and not have these projects ... access through existing established communities.

He testified that Overlook Way is neither an arterial nor a collector road, but is, and was designed to be, a "local road," which is intended to "collect[ ] and distribute traffic within subdivisions and provide direct access to individual land uses." *Id.*

McClune described Hickory Overlook as a COS development with frontage on U.S. Route 1 and internal streets. He added that Bel Air's interpretation of "direct access" would allow any "project" to meet the threshold requirement for direct access for a COS, provided it had *any* access to a local road. *Id.* McClune concluded that, "for projects to go COS they must be immediately accessible to the arterial road. Frontage on [a] primary residential road does not grant the ability for a COS project." [5]

---

5. McClune gave, as a prime example of the legislative meaning of the "directly accessible" requirement, the case of Continuing Care Retirement Communities (CCRC). This type of community is a "special development" project which also required "direct access" from an arterial or collector road. *See* Harford County Zoning Code § 267–49.1. In that instance, the County Council amended the Code to relax the accessibility requirement so that it could be satisfied by direct access not only to arterial and collector roads, but also to primary residential roads. *Id.,* as amended by Council Bill 98–36. According to McClune, this demonstrates that the Council, should it have intended a project to be "directly accessible" to a residential road such as Overlook Way, would have so provided in the Code.

McClune was vigorously cross-examined about three projects that appeared not to have satisfied the "direct access" requirement, but which were nevertheless approved for COS development: Spenceola, Deer Creek, and Woodland Run. McClune explained that these projects were connected, or incorporated, in some manner to a larger development, with common ownership or unified planning, and were approved as part of a larger development, or "concept plan," which larger development qualified because it abutted on an arterial or collector road.[6]

McClune explained the Department's position in terms of land use planning, opining that

[h]igher density projects basically should be located so that basically there is a road network that gets them out to an arterial or collector road.

I don't think it would be good land use planning to have lower density developments with local roads going through them and somewhere in the back higher density developments basically accessing through them.

Additional facts as may be necessary for the resolution of the issue on appeal will be set forth in our Discussion.

## DISCUSSION

### I. Jurisdiction

■ Initially, we address the matter of our jurisdiction. The circuit court's reversal of the Board's decision, and accompanying remand for further administrative proceedings, constitutes a final appealable order. In *People's Counsel for*

---

**6.** McClune said that a "concept plan" is the initial review of a project, and is subject to revision. He recalled that Bel Air Realty had not to date submitted a concept plan for the subject property. As to the three "anomalous" projects that had met with Department approval, Spenceola, Deer Spring, and Woodland, McClune explained that Spenceola and Woodland were eventually developed as part of a unified concept plan that had been amended to incorporate them. Deer Spring originally accessed a road through an intervening business development, but it also was incorporated into a single project. They became part of an overall scheme which was then approved by the Department.

*Baltimore County v. Country Ridge Shopping Center, Inc.*, 144 Md.App. 580, 799 A.2d 425 (2002), Judge Moylan encountered the question of this Court's jurisdiction under similar circumstances, and reiterated that a circuit court's remand to an administrative agency for further proceedings satisfies the "final order" predicate because the circuit court's remand " 'terminates the judicial proceeding[.]' " 144 Md.App. at 591, 799 A.2d at 432 (quoting *Schultz v. Pritts*, 291 Md. 1, 6, 432 A.2d 1319, 1323 (1981)). This appeal is timely. We therefore have jurisdiction over the circuit court's order. Maryland Code (1974, 2002 Repl.Vol.), §§ 12–301, 12–308 of the Courts and Judicial Proceedings Article.

## II. Decisions Below

The hearing examiner accepted the Department's interpretation of Section 276–46B(4)(b), as presented by the hearing testimony of Anthony McClune, Manager, Division of Land Use Management, Department of Planning and Zoning:

Mr. McClune noted, in accord with the dictionary (and common sense) meaning of "direct", that the Department also looks to see if the project, taken as a whole, has direct (i.e. "immediate", "the shortest way", "with nothing or no one between"[ ]) access to a collector or arterial roadway. The facts here are clear, the subject property does not have such direct access. In fact, the State Highway Administration denied the property direct access to Business Route 1. The Hickory Overlook subdivision is between the subject property and Business Route 1. The subject property is not part of the Hickory Overlook project and therefore, the subject property cannot be considered to be directly accessible to Business Route 1.

In concluding that direct access to Business Route 1 had not been achieved in this instance, the hearing examiner referred to the definition of "direct" as set forth in *Webster's New World Dictionary* (2d College ed.1976), to ascertain that the commonly accepted meaning of "direct" included "nothing or no one between; immediate; close, firsthand...."

The hearing examiner was not converted by the developer's argument that direct access to Business Route 1 was achieved because Overlook Way was "unobstructed." Nor was she persuaded by Bel Air's reliance on the Zoning Code's definition of "Primary Residential Road," as Overlook Way is characterized, as a way which provides "direct access between minor residential roads and collectors." [7]

The hearing examiner further concluded that an acceptance of Bel Air's argument would effectively entitle any project to COS classification as long as it could reach an arterial or connector roadway through an adjoining subdivision. She reasoned that this approach would thus "render the requirement of 'direct' accessibility ... superfluous."

On Bel Air's appeal, the circuit court reversed the Board's decision, rejecting the view that "direct access" required a project to abut or front on an artery or collector road. The circuit court noted that the Code does not define [8] the phrase "directly accessible," but concluded:

Applying the principles of statutory construction ... there can be no doubt that [Bel Air's] property has direct access to Route 1 across Overlook Way. Overlook Way is a county

---

**7.** "Primary Residential Road" is defined in the Zoning Code as:

A major local road distributing and collecting traffic within larger residential subdivisions or neighborhoods, and performing the following:

A. Provides direct access between minor residential roads and collectors and minimal direct driveway access to abutting properties.

B. Distributes traffic generated within a neighborhood to collector roads.

C. Carries a limited amount of through traffic.

Harford County Zoning Code, § 267–4.

**8.** The court likewise consulted a dictionary, in this instance *Webster's New Collegiate Dictionary* (edition not noted), to obtain a definition of the term "direct" as "[i]n a direct manner, without delay, to follow a straight course proceeding from one point to another." However, one knows the intended meaning of a word only when one knows how the word is used in context. Knowing the dictionary definition of a word may not convince but only confuse. For example, in the phrase "ship flounders," what does the author intend to communicate? Is the phrase a newspaper headline? Or perhaps an order to a fish monger?

road. Overlook Way is not obstructed in any way. The county's own definition of access describes it as an unobstructed way or means of approach to provide entry to or exit from a property. Overlook Way indeed provides entry to and exit from Appellant's property.

The position that a property can only be directly accessible if it abuts the road contradicts the definition of road, arterial road, collector road and local road in Section 267–4 of the Zoning Code. For example, road is "... intended for motor vehicle traffic and provides a princip[al] means of access to property." Local road is "a road which collects and distributes traffic within the subdivisions and provides direct access to individual land uses. Local roads may include primary and minor residential roads as well as business/industrial roads." Similar definitions are used for collector and arterial roads.

The circuit court also observed, somewhat critically, that the Department's intent to limit the flow of traffic from higher density projects through a lower density subdivision, to prevent "stacking" of subdivisions, was inconsistent with its policy of granting exceptions in cases where the projects were combined for approval in a unified concept plan. *See* note 5, *supra*, and accompanying text. The treatment of these projects by the Department of Planning and Zoning detracted from the authority of its view that "direct access" meant access to a qualifying road from an adjacent property.

In the final analysis, the court found "as a matter of law, that the Zoning Hearing Examiner's legal conclusion as to the meaning of the term directly accessible was in error." It ruled instead that the Bel Air project is "directly accessible to Route 1 over a public road."

### III. Standard of Review

On the People's Counsel's appeal from the circuit court's order, we review the Board's decision *de novo*, relying on the "same statutory standards as [did] the circuit court." *Maryland Division of Labor and Industry v. Triangle General Contractors, Inc.,* 366 Md. 407, 416, 784 A.2d 534, 539

(2001). *See Country Ridge,* 144 Md.App. at 591, 799 A.2d at 432 (reviewing court effectively looks through circuit court's action toward decision by Board of Appeals); *accord, Heard v. Foxshire Associates, LLC,* 145 Md.App. 695, 699, 806 A.2d 348, 350 (2002) (appellate court reviews issues as did circuit court).

Our review is limited to determining whether the Board's findings and conclusions are supported by substantial evidence based on the record as a whole and whether the Board's decision accords with applicable law. *See Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376, 380 (1999); *Eller Media Company v. Mayor and City Council of Baltimore,* 141 Md.App. 76, 83–84, 784 A.2d 614, 618 (2001). *See also Blakehurst Life Care Community v. Baltimore County,* 146 Md.App. 509, 517, 807 A.2d 179, 184 (2002). In conducting our review, we are limited to the record developed before the agency. *See Erb v. Maryland Dept. of the Environment,* 110 Md.App. 246, 266, 676 A.2d 1017, 1028 (1996). In *Eger v. Stone,* 253 Md. 533, 253 A.2d 372 (1969), the Court of Appeals emphasized, with respect to judicial review of agency determinations of fact:

> We have made it quite clear that if the issue before the administrative body is "fairly debatable", that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body, in the absence of an unconstitutional taking of private property for public use without the payment of just compensation.

253 Md. at 542, 253 A.2d at 377. *See also White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079–80 (1999).

 Our standard of review subsumes the concept of judicial restraint. In conducting our review, we defer to those findings of the Board that are supported by the record and consider the Board's decision as *prima facie* correct and presumptively valid. *Banks,* 354 Md. at 68, 729 A.2d at 381.

 With respect to statutory interpretation, we will likewise defer in the appropriate case to an agency's interpre-

tation and application of its organic statute. *See id.* Thus, our scope of review is rather circumscribed. *Eastern Outdoor Advertising Co. v. Mayor and City Council of Baltimore,* 128 Md.App. 494, 515, 739 A.2d 854, 865 (1999), *cert. denied,* 358 Md. 163, 747 A.2d 644 (2000). Agencies are too often chided for maladroit interpretations. We will apply the same principles of statutory construction to the Harford County Code as are required in the interpretation of any statute or regulation. *See Young v. Anne Arundel County,* 146 Md.App. 526, 573, 807 A.2d 651, 679 (2002) (citing *Howard Research and Development Corp. v. Concerned Citizens for the Columbia Concept,* 297 Md. 357, 364, 466 A.2d 31, 34 (1983)). Because this appeal requires us to construe the language of the Zoning Code, "[t]he cardinal rule of [statutory construction] is to ascertain and effectuate the legislative intent." *The Pack Shack, Inc. v. Howard County,* 371 Md. 243, 252, 808 A.2d 795, 800 (2002). *See Marriott Employees Federal Credit Union v. Motor Vehicle Administration,* 346 Md. 437, 444, 697 A.2d 455, 458 (1997). In order to ascertain the Council's intent, we begin with the pertinent language of the Zoning Code, and ordinarily will not venture beyond its clear and explicit terms. *See id.*

We owe no deference when the agency's conclusions are premised on an error of law. *See Alviani v. Dixon,* 365 Md. 95, 109, 775 A.2d 1234, 1242 (2001). *Cf. Department of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 118, 771 A.2d 1051, 1057 (2001) (citations omitted) (completely subject to review; some deference accorded). "In such a case the Court's review 'is expansive, that is, the appellate court may substitute its judgment for that of the administrative agency.'" *Harford County, Maryland v. McDonough,* 74 Md.App. 119, 122, 536 A.2d 724, 725 (1988) (quoting *Gray v. Anne Arundel County,* 73 Md.App. 301, 309, 533 A.2d 1325, 1329 (1987)). But the administrator's "expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was 'premised upon an erroneous conclusion of law.'" *Marzullo v. Kahl,* 366 Md. 158, 173, 783 A.2d 169, 178 (2001) (quoting *Banks,* 354 Md. at 68, 729 A.2d at 380). *See State Ethics*

*Commission v. Antonetti*, 365 Md. 428, 447, 780 A.2d 1154, 1166 (2001).

## IV. "Directly Accessible"

### *Legislative and Judicial Constructions*

█ Appellant initially urges that Section 267–46B(4)(b) is not ambiguous in its requirement that a proposed COS subdivision must have direct access to a qualifying roadway. Reading the zoning code as a whole, appellant maintains that a project whose required access must pass through another subdivision to reach a qualifying road does not have "direct access" thereto. Citing the definition of the term "access" at Section 267.4 as an "[u]nobstructed way or means of approach," in combination with the dictionary [9] meaning of the term "direct" ("nothing or no one in between; immediate; close, firsthand"), appellant asserts that the Bel Air project fails to measure up to the standard. Appellant further contends that the circuit court ignored the "long-standing" interpretation of Section 267–46 by the Department of Planning and Zoning, the agency charged with its administration, urging that the Department has consistently "interpreted the statute in a uniform fashion, one consistent with its suggested interpretation in this case."

Bel Air retorts that the Board's reliance on McClune's testimony to hold that the Bel Air property is not directly

---

9. The parties' reliance on dictionaries to offer their respective interpretations of the phrase "directly accessible" is a prudent method of determining the meaning of ordinary language that populates most statutes. As observed by Judge Raker for the Court of Appeals in *Marriott Employees Federal Credit Union v. MVA*, 346 Md. 437, 697 A.2d 455 (1997):

> Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, *see Morris v. Prince George's County*, 319 Md. 597, 606, 573 A.2d 1346, 1350 (1990), "dictionaries ... do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." 2A [N.] SINGER [SUTHERLAND STATUTORY CONSTRUCTION (5th ed.1993)], *supra*, § 47.28 (1996 Cum.Supp.).

*Id.* at 447, 697 A.2d at 460.

accessible to Route 1 is misplaced. It denigrates McClune's failure to support his interpretation of Section 267–47B(4)(b) with legislative history, and points out that McClune's testimony conflicts with prior interpretations of the Code by the Department of Planning and Zoning. Bel Air Realty criticizes the Hearing Examiner's failure to consider that Overlook Way is a "Primary Residential Road," which by definition "[p]rovides direct access between minor residential roads and collection and minimal direct driveway access to abutting properties." *See* Zoning Code § 267–4.

Bel Air relies on the unambiguous definition of "access" in the Code to support its position that Overlook Way "affords an unobstructed way or means of approach to provide entry to or exit from the Subject Property." *See* Section 267–4. Bel Air, like a contemporary Cassandra, predicts that the Department's view will effectively add surplusage to the Code under its interpretation of Section 267–46B(4)(b). Prediction, however, is very difficult, especially about the future. Bel Air reasons that, because the County Council has specified a "frontage requirement" for other types of developments, such as shopping centers, schools, camps and mobile home parks, then Section 267–46B(4)(b) would likewise contain specific language imposing a "frontage" requirement.

The developer also asserts that language in the Zoning Code requiring that certain uses have access "from" an arterial or collector road indicates that the County Council, had it intended to impose in the same legislation a "frontage" prerequisite for a COS project to be "directly accessible" to a qualifying road, would have used the same language in its enactment of the Zoning Code.

We are not persuaded by Bel Air's reliance on other provisions of the Zoning Code to dictate an interpretation of Section 267–46B(4)(b). For example, we see no inconsistency between the *explicit* frontage requirements for certain shopping centers (300 feet, Section 267–47B(1)), mobile home parks (200 feet, Section 267–48C(1)(b)), camps (200 feet, Section 267–

53F(2)(b)), or schools (300 feet, Section 267–53C(7)(a)[2] ), and the "directly accessible" criterion for COS developments.

We have carefully reviewed Bel Air's argument with respect to the access language for special exceptions,[10] and agree that it has force. Nevertheless, we are not convinced that the access standards for certain special exception institutions would dictate the interpretation sought by Bel Air in this case. We note that the County Council amended the accessibility criterion for housing for the elderly and for "Continuing Care Retirement Communities" specifically to allow such communities to meet the "directly accessible" standard when such access is obtained only by a residential road. *See* Sections 267–49B(4)(b), 267–49.1.A(4). Under the circumstances here, this is a clear indication of the legislature's view of the meaning of the phrase "directly accessible."

 We disagree with the circuit court's determination that the decision of the Board cannot be sustained. The Zoning Code explicitly dictates that the project be *directly* accessible. The circuit court and Bel Air Realty effectively maintain that "access" alone satisfies this requirement, because the court's holding is based on the fact that "Overlook Way is certainly an unobstructed means of approach to provide entry to or exit from [the] property." But this approach virtually conflates the phrase "directly accessible" into the definition of "access." In interpreting legislation, a tribunal must " 'giv[e] effect to all of [its] parts . . . rendering no part of the law surplusage.' " *Chen v. State,* 370 Md. 99, 106, 803 A.2d 518, 522 (2002) (quoting *Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 252, 753 A.2d 501, 508 (2000)).

In short, we conclude that the adverb "directly" qualifies the adjective "accessible" to some extent and does so in a

---

**10.** Article VIII of the Zoning Code governs "Special Exceptions," such as arenas, country clubs, fairgrounds, marinas, go-cart tracks, driving ranges, and various institutional uses, and sets forth design characteristics for them. *See* Sections 267–51 *et seq.* Section 267–53 articulates "Specific Standards" for these special exceptions, one of which is that "principal access shall be provided *from* an arterial or collector road." (Emphasis added.)

manner that effectuates the interpretation set forth by the Board of Appeals and the Department of Planning and Zoning. We find persuasive the analysis by the North Carolina Supreme Court in *Penny v. City of Durham*, 249 N.C. 596, 107 S.E.2d 72 (1959). In *Penny*, the plaintiffs, certain residents of Durham, challenged a proposed shopping center planned for their immediate area. The commercial parcel on which the shopping center was to be placed was separated from the residents' homes both by an avenue and a "buffer strip" that was owned by the same developer and which fronted on the avenue.

The future of the shopping center project depended on the developer's success in obtaining a rezoning of the parcel from residential to commercial. The rezoning was approved by the Durham City Council by a simple majority vote. The homeowners challenged the approval, asserting that the Council's action was lawless. They maintained that because the owners of twenty percent or more of lots which were "directly opposite" to the proposed shopping center had lodged written protests to the shopping center project, the necessary ordinance had to be passed by more than the simple majority which had approved the rezoning.

The North Carolina Supreme Court rejected the homeowners' argument. Delving into the ordinary meanings of the pertinent terms "directly" and "opposite," and relying on *Webster's New International Dictionary*, Second Edition, the court ruled that the proposed shopping center was not "directly opposite" the plaintiffs' residential area, notwithstanding the fact that the same developer owned the buffer strip that bordered on the roadway that was common both to its land and the homes of the protestants. The court concluded:

[O]pposite ... is qualified by the word "directly," and some meaning must be given to the word "directly" when used conjunctively with the word "opposite." To express it another way, the legislature would not have used the word "directly" as a mere redundancy; it was intended to modify, limit or enlarge the word "opposite." It seems to us that the only definitions of "directly" that would, under the

circumstances in this case, really modify "opposite" are: "without anything intervening; next in order."

*Penny,* 249 N.C. at 600, 107 S.E.2d at 75–76. *See generally,* Grant Gilmore & Charles L. Black, Jr., THE LAW OF ADMIRALTY 424 (2d ed. 1975) (" 'Adjoin' presumably means something like 'border on' or 'have direct access to' navigable waters . . . .").[11]

In *City of Geneva v. Ory,* 89 Ill.App.3d 1118, 45 Ill.Dec. 356, 412 N.E.2d 707 (1980), the interpretation of the phrase "direct access" by a state highway department held considerable force in applying that language in a prosecution for a traffic offense. In that case, a motorist was charged with speeding in an "urban district." He sought the reversal of his conviction because the stretch of highway where the alleged offense occurred did not qualify as an "urban district," because the housing density did not meet the standards for that classification. The distinction was important, for, as noted by the Illinois Appellate Court, "[i]f the zone [were] not an 'urban district,' the posted limit [would be] below the minimum permitted by statute and therefore invalid and unenforceable." 89 Ill.App.3d at 1118, 45 Ill.Dec. 356, 412 N.E.2d at 708. Although the road was found to be contiguous to a densely populated subdivision, only a few structures actually bordered on the subject road. Relying on an interpretation by the Illinois Department of Transportation to the effect that structures counted in establishing an "urban district" should include only those that have direct access to the highway, the homes in the subdivision "which have no direct access" to the road in question "should not have been considered by the trial court for the purpose of denominating that roadway as an

---

**11.** The Gilmore and Black treatise is cited in *Sidwell v. Express Container Services,* 71 F.3d 1134, 1138 (4th Cir.1995), *cert. denied,* 518 U.S. 1028, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996), a case arising under the federal Longshore and Harbor Workers' Compensation Act (LHWCA). 33 U.S.C. §§ 901 *et. seq.* The geographic situs of an injury is one factor that is crucial to the issue of coverage under the LHWCA, because that statute will reach a "covered situs" only if that location "adjoins" navigable waters.

'urban district [even though the subdivision contained other structures that were joined to another road].'" *Id.* at 1119, 45 Ill.Dec. 356, 412 N.E.2d at 709. The conviction was reversed.

In *Metropolitan Board of Zoning Appeals of Marion County v. Avis Rent A Car System, Inc.*, 575 N.E.2d 33 (Ind.App. 1991), an automobile rental business, Avis, sought to place a "pole sign" on its property in Indianapolis. It needed a zoning variance to do so, and its request for this was administratively denied. One requirement for the placement of the sign was that there would be "direct access" to the business. The planning department had determined that the business did not have "direct access" to surrounding roads because the Avis property entrance and exits were subject to cross-easements in favor of abutting property owners, also freestanding businesses. The Board of Zoning Appeals agreed, but the Indiana trial court and Court of Appeals did not, and the courts ruled that the existence of an easement did not cut off direct access in this case.[12] The intermediate appellate court, referring to the definition of the term "access" in *Black's Law Dictionary* (5th ed.1979) "to include the right vested in the owner of land which adjoins a road or other highway to go and return from his own land to the highway without obstruction[,]" concluded:

> Applying the common, ordinary definition of "direct access" to the facts before us, the mere existence of a use-easement in itself does not obstruct the ingress or egress onto Avis' property. The trial court therefore properly reversed the Board's determination that there was no direct access to and from Avis' property.

*Id.*, 575 N.E.2d at 36–37. *See generally BIK Associates v. Troup County*, 236 Ga.App. 734, 734, 513 S.E.2d 283, 284 (1999) ("land which abutted and [was] directly accessible to Highway").

---

**12.** "An easement is broadly defined as a nonpossessory interest in the real property of another[.]" *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630, 635 (1984) (citations omitted). The easement does not constitute intervening property.

The above premises considered, we have no difficulty in concluding that the County Council[13] intended the Zoning Code to require that the phrase "directly accessible" entail that a conventional with open space development lie adjacent to, bind, abut or front, a collector or arterial road. We are mindful that "zoning ordinances are in derogation of the common law and should be strictly construed." *Gino's of Maryland, Inc. v. Mayor and City Council of Baltimore,* 250 Md. 621, 642, 244 A.2d 218, 230 (1968), *cited with approval in White v. North,* 356 Md. 31, 48, 736 A.2d 1072, 1082 (1999). But when the language of the statute is clear, a tribunal, in this case the Board, "may neither add nor delete language, so as to 'reflect an intent not evidenced in that language.'" *Chesapeake and Potomac Telephone Co. of Maryland v. Director of Finance,* 343 Md. 567, 579, 683 A.2d 512, 518 (1996) (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993)). To accept Bel Air Realty's view, we believe that the Board would have been constrained to read the term "directly" out of the Zoning Code.

Finally, we believe that Bel Air's reliance on the definition of "Primary Residential Road," Section 267–4, as a buttress for its position, is misplaced. The Zoning Code defines "Primary Residential Road" as one that "[p]rovides direct access between minor residential roads and collectors and minimal direct driveway access to abutting properties." But that same definition dictates that such a road "carr[y] a *limited* amount of traffic." (Emphasis added.) To permit a primary road to handle traffic from Bel Air Realty's project through Hickory Overlook to Business Route 1 would appear to this Court to contradict the letter and spirit of the definition of a "Residential Road."

---

**13.** Although the County Council sits as the Board of Appeals, we will not treat them as identical bodies for purposes of statutory interpretation. They may have the same membership, but they are different entities depending on their role. *See County Council v. Dutcher,* 365 Md. 399, 403 n. 1, 780 A.2d 1137, 1139 n. 1 (2001).

*Administrative Interpretation*

 We also conclude that, even if the phrase "directly accessible" were ambiguous to the point of obscuring the evident meaning of the statute, and the intent of the County Council, the administrative interpretation of the "directly accessible" requirement, as applied by the Department of Planning and Zoning, voiced through the testimony of Mr. McClune, and sanctioned by the Board of Appeals, trumps the testimony of Bel Air Realty's experts and its interpretation to the contrary. Again, we must respect the expertise of the agency. *See Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 266–67, 753 A.2d 501, 516 (2000). The Court of Appeals has outlined several factors that inform our review of administrative interpretations:

> The consistent and long-standing construction given a statute by the agency charged with administering it is entitled to great deference, *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986), as the agency is likely to have expertise and practical experience with the statute's subject matter. *See, e.g., Sinai Hosp. v. Dept. of Employment,* 309 Md. 28, 46, 522 A.2d 382, 391 (1987); 2B N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 49.05, at 17 (5th ed.1993). The weight given an agency's construction of a statute depends on several factors—the duration and consistency of the administrative practice, the degree to which the agency's construction was made known to the public, and the degree to which the Legislature was aware of the administrative construction when it reenacted the relevant statutory language. *Magan v. Medical Mutual,* 331 Md. 535, 546, 629 A.2d 626, 632 (1993). Other important considerations include "the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation" and "the nature of the process through which the agency arrived at its interpretation," with greater weight placed on those agency interpretations that are the product of adversarial proceedings or formal rules promulgation. *Balto. Gas & Elec.,* 305 Md. at 161–62, 501 A.2d at 1315.

*Marriott Employees Federal Credit Union,* 346 Md. at 445–46, 697 A.2d at 459.

We are convinced that the Department's interpretation is a persuasive articulation of the "directly accessible" language of Section 267–46B(4)(b). Again, the expertise of the Department of Planning and Zoning must be taken into account. *See Banks,* 354 Md. at 68–69, 729 A.2d at 381; *Angelini v. Harford County,* 144 Md.App. 369, 374, 798 A.2d 26, 29 (2002). Although Bel Air contests the weight to be accorded Mr. McClune's testimony, challenging the Department's allowance of exceptions for three development projects, we note that the Department's representative emphasized that he had become Chief of the Development Review Section in 1990, and had reviewed all concept plans since that time, including "several dozen" COS developments. This is evidence of a consistent application of the criteria for COS development. Further, the Department had discussed its view as to the nature of the "directly accessible" requirement with the County Council when that body amended the direct access requirements for continuing care and elder care institutions.

Even if we were to concur with the circuit court's view that the application of this policy was inconsistent in the Department's approval of the Spenceola, Deer Spring, and Woodland projects, we would not accept the view, proffered by Bel Air Realty and adopted by the circuit court, that this inconsistency detracts from the validity of the administrative construction of the Zoning Code. In the final analysis, however, we find McClune's explanations of the approval processes for these developments to be persuasive, and not out of line with the Department's overall view that "directly accessible" means what has been proffered by the administrators in this case.

We are also in agreement with the prudential concerns that the Department seeks to avoid the pitfalls that are caused by poor planning, in this case a "stacking" of developments, and agree with a noted commentator that "[t]he power to regulate the subdivision of land has been employed, in conjunction with zoning authority, to control the pace and *sequence of develop-*

*ment."* 4 Kenneth H. Young, *Anderson's American Law of Zoning* § 25.03, at 288 (4th ed.1997) (emphasis supplied).

We are convinced that Mr. McClune's testimony articulates a "consistent and long-standing construction" of the Zoning Code by the Department of Planning and Zoning, such that the circuit court erred by holding that the Board's acceptance of this interpretation of Section 267–46B(4)(b) is not entitled to deference.

We also note that the Department's view concerning direct access and abutting property has not developed in a vacuum. It has been recognized, for example, that the landowner of property located adjacent to a roadway or highway enjoys a common law right of access. *See City of Wichita v. McDonald's Corp.,* 266 Kan. 708, 718, 971 P.2d 1189, 1197 (1999); *Davidson v. Kitsap County,* 86 Wash.App. 673, 684–85, 937 P.2d 1309 (1997). In *D'Arago v. State Roads Commission,* 228 Md. 490, 180 A.2d 488 (1962), Chief Judge Brune wrote for the Court of Appeals:

> Although the origin of the right of access to public streets inhering in abutting property owners is said to be obscure (*see Bacich v. Board of Control,* 23 Cal.2d 343, 350, 144 P.2d 818), it is a well established right in the nature of an easement appurtenant to the abutting land on an existing highway, and a condemnee is entitled to compensation for the taking thereof.

*Id.* at 494, 180 A.2d at 490 (citations omitted). *See Hillyard v. Chevy Chase Village,* 215 Md. 243, 247, 137 A.2d 555, 557 (1958). *See generally Langley Shopping Center, Inc. v. State Roads Commission,* 213 Md. 230, 235, 131 A.2d 690, 693 (1957); *Walters v. Baltimore & Ohio R.R.,* 120 Md. 644, 656–57, 88 A. 47, 52 (1913); William B. Stoebuck, *The Property Right of Access versus the Power of Eminent Domain,* 47 Tex. L.Rev. 733, 733–38 (1969). *Cf. Goldstein v. City of Baltimore,* 273 Md. 85, 88–89, 327 A.2d 770, 772–73 (1974) (absent statutory relief, compensation lies for destruction of access but not limitation thereof).

Further, the phrase "access management" appears to be a term of art in the area of zoning and planning. According to Ronald K. Giguere, Chairman of the Committee on Access Management, Federal Highway Administration:

> The Committee on Access Management views access management as the control of access *along* surface (nonfreeway) streets—primarily arterials and major collectors. The concept concentrates on restricting the number of direct accesses to major surface streets, providing reasonable indirect access, effectively designing driveways, and enforcing safe and efficient spacing and location of driveways. A variety of techniques are available for achieving access control. They include geometric design considerations, such as medians and channelized islands that prohibit certain turning movements; consolidation actions, such as joint use of driveways and service roads; and others, such as removal and relocation of existing access and the introduction of auxiliary lanes for left and right turns. If these types of improvements are implemented correctly, we can expect significant dividends in terms of smoother vehicle flow, reduced delay, and fewer crashes.

Ronald K. Giguere, Access Management, Transportation Research Board (2000) (emphasis supplied).[14] *See generally,* Ross D. Netherton, CONTROL OF HIGHWAY ACCESS 152–201, 341–380 (1963); *Access Management Slows Incidence of Traffic Accidents,* PUBLIC WORKS, Feb. 1995, at 39.

To be sure, notwithstanding authority which describes the relationship between land and adjacent roadways as "direct," we are aware that the terms "direct" and "accessibility" may also connote more general usage, and are not limited to situations where property bounds or abuts a roadway. *See, e.g., Chicago and Northwestern Transportation Company,* 1989 WL 238959, 1989 ICC LEXIS 180 *2 (1989) (proposed final link in highway project intended to provide central Waterloo, Iowa, with "direct access" to Interstate 380 and

---

14. Http://www.nationalacademies.org/trb/publications/millenni um/ 00000.pdf.

entire highway network); *Appeals of Time Contractors, J. V.,* 1987 WL 46576, 1987 DOT BCA LEXIS 64 *8 (1987) (proposal to extend Dulles access road to connect to Interstate Route 66 and then provide "direct access" to Washington, D.C.). *See also* Environmental Impact Statement: Shasta and Trinity Counties, 67 Fed.Reg. 44922 (July 5, 2002) ("project portion of highway ... represents only obstacle preventing interstate trucks ... from utilizing this direct access to the coast"); Environmental Impact Statement: King County, Washington, 57 Fed.Reg. 44225 (Sept. 24, 1992) (interchange and express-way, providing "direct access" to and from south on Interstate 5); Environmental Impact Statement: City of Lancaster, etc., 49 Fed.Reg. 7021 (Feb. 24, 1984) (proposed highway would provide "direct access" to downtown, avoiding local traffic).

All things considered, however, we hold that the phrase "directly accessible" in Section 267–46B(4)(b) unambig-uously requires that the property at issue be proximate, immediate, front on, or abut a qualifying arterial or collector road.

We recognize that agencies need freedom to avoid perverse consequences from statutory prescriptions and should be granted meaningful leeway to interpret statutes in light of their underlying purposes. We conclude in the alternative, that, even if this legislative terminology were ambiguous, its interpretation by the agencies charged with the administration of the Harford County Zoning Code is reasonable, does not conflict with the terms of the Code, and is entitled to defer-ence.

In the final analysis, we find that Bel Air's project is not "directly accessible" from Business Route 1 as a matter of law. We therefore reverse the judgment of the circuit court.[15]

---

**15.** We have reviewed the cases that were cited by the circuit court in support of its position that direct access does not require that the property at issue front on, or adjoin or abut a qualifying road. *See Maryland–National Capital Park and Planning Comm'n v. Washington Business Park Assoc.,* 294 Md. 302, 449 A.2d 414 (1982); *Pistorio v. Zoning Board of Howard County,* 268 Md. 558, 302 A.2d 614 (1973);

**JUDGMENT REVERSED;**

**COSTS TO BE PAID BY APPELLEE.**

*County Council for Prince George's County v. PEPCO,* 263 Md. 159, 282 A.2d 113 (1971); *Rohde v. County Bd. of Appeals for Balt. County,* 234 Md. 259, 199 A.2d 216 (1964); *Mayor and City Council of Baltimore v. Bruce,* 46 Md.App. 704, 420 A.2d 1272 (1980). We do not find them to be persuasive authority on the issue raised here.