920 A.2d 518

**Lawrence SWOBODA, et al.**

v.

**Charles WILDER, et ux.**

**No. 0070, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

April 4, 2007.

616

618

J. Carroll Holzer, Towson, for appellant.

Justin J. King, Towson, for appellee.

Panel ADKINS, WOODWARD and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned) JJ.

ADKINS, J.

In this appeal from the approval of a Rodgers Forge building permit, we shall hold that determining the front, side, and rear orientation of a townhouse end unit situated at the corner of intersecting streets requires consideration of all physical characteristics of the property, not merely street address and foundation walls, and that in an appropriate case an end unit may front on a different street than the interior units in the same townhouse group.

The residence at the center of this litigation is an end of group townhouse at the corner of Pinehurst and Murdock Roads. The hotly debated question in Rodgers Forge is: which of these intersecting streets does this property front? The answer mattered to appellees Charles and Brigid Wilder,[1] because it determined where the front, side, and rear yards are located on their property, and consequently, whether the renovation plans approved by the Baltimore County Board of Appeals (the Board) comply with county setback requirements.

The interior townhomes that lie between the Wilder home and the corresponding end unit of this housing group unquestionably face Murdock Road. Like these neighbors, the Wilder

---

1. After briefing, the Wilders advised that they sold the property. They elected not to participate in oral argument.

home has a Murdock Road mailing address. Unlike the interior homes and the other end unit in this townhouse group, however, both the front door and the floor plan of Wilder property are oriented toward Pinehurst Road. Citing that orientation, the Department of Permits and Management, the Zoning Commissioner, and the Board concluded that the property fronts on Pinehurst Road for setback purposes. The Circuit Court for Baltimore County affirmed the Board.

Appellants are the Wilders' neighbors and the Rodgers Forge Community Association (the Protestants).[2] They challenge the Board's decision, decrying its precedential effect on their individual properties and their community as a whole. They raise three questions for our review, which we restate as follows:

I. Did the Board err in failing to rule as a matter of law that Murdock Road is the front of the subject site?

II. Did the Board err in considering the testimony of the Wilders and their architectural expert Warren G. Nagey of Chesapeake Design Group?

III. Is the Board's decision arbitrary and capricious in light of its "inconsistent" prior decision in *Dorothy K. and Cheryl* A. Milligan, No. 02–519–A?

We find neither error nor inconsistency, and affirm the judgment.

## FACTS AND LEGAL PROCEEDINGS

### Baltimore County Zoning Laws

The setback requirements for the Wilder property are 10 feet for side yards and 50 feet for rear yards. *See* Baltimore

---

2. Appellants are the Rodgers Forge Community Association and individual residents of Rodgers Forge: Lawrence Swoboda, Joseph Segreti, John and Norma O'Hara, Ron and Carol Zielke, Renee Rees, Sarah Kahl, Doug Campbell, Jennifer Clouse, Brent and Ann Matthews, Claire McGinnis, Jean Duvall, Bruce Hirshauer, Jeff Wible, Jennifer Sheggrud, Bernice Hirshauer, Barbara Leons, Robert Williams, and Roxanne and John Rinehart.

County Zoning Regulations (BCZR) Art. 1B01.C. The County defines front, rear, and side yards as follows:

**YARD, FRONT—A yard extending across the full width of the lot, between the front lot line and the front foundation wall of the main building.**

YARD, REAR—A yard extending across the full width of the lot, between the rear lot line and the rear foundation of the main building.

YARD, SIDE—A yard extending from the front yard to the rear yard, between the side lot line and the side foundation wall of the main building.

BCZR § 101 (emphasis added).

Section 400 of the BCZR governs accessory buildings in residential zones, providing in pertinent part:

400.1 Accessory buildings in residence zones ... shall be located only in the rear yard and shall occupy not more than 40% thereof. On corner lots they shall be located only in the third of the lot farthest removed from any street and shall occupy not more than 50% of such third. . . .

400.2.b For the purposes of determining required setbacks, ... alleys shall be considered the same as existing (improved) streets. **The same shall apply to corner lots regarding the placement of accessory buildings** . . . .

400.3 The height of accessory buildings ... shall not exceed 15 feet. (Emphasis added.)

### The Neighborhood And Property

Rodgers Forge is a Baltimore County community of approximately 1,800 brick residences that were developed beginning in the late 1930's by the James Keelty Company as a planned row house development. The neighborhood consists of six parallel streets running east-west and four intersecting streets running north-south; it lies between Bellona Avenue and York Road.

The Wilder lot is a trapezoid shaped 0.8 acre corner lot, zoned D.R. 10.5, with its longest street frontage being 113'4" along Pinehurst Road and its shortest frontage being 31'6" along Murdock Road. The property gradually widens from Murdock Road, to a width of 58'3" along a 15' alley that parallels Murdock Road and intersects Pinehurst Road. Although approximately 600 homes in "the Forge" are end of group units, many of these differ from the Wilder residence in that they (a) are not located on a corner lot, (b) have their main entrances leading from the same street as all the interior homes in their housing group, (c) have only one exterior door that faces the "address" street, and/or (d) share the same roofline, footprint, and common foundation walls as the interior units in the same group.

Photographs show that the roofline of the Wilder residence is trussed perpendicularly to the common roof line of the interior units in the same housing group, so that the Wilder roof faces west toward Pinehurst Road rather than north toward Murdock Road. In addition, the Wilder residence has a different and larger footprint than the adjacent interior residences in the housing group. Specifically, the Wilder residence is wider and deeper than adjacent interior units, so that the east wall separating appellant Goldman's residence from the Wilder residence is only partially shared. Moreover, as a result of this larger footprint, the common foundation wall facing north toward Murdock Road, in which all interior units of this housing group have their front entrances, "dead ends" into the east wall of the Wilder residence, forming a 90 degree corner where Goldman's residence intersects with the Wilder residence. Similarly, the rear foundation wall common to the interior units ends at another 90 degree corner into the alley side of the Wilders' east wall.

The floor plan of the Wilders' home is oriented so that a centrally located entry door and hallway faces west toward Pinehurst Road. Off this foyer are a living room, dining room, and staircase. Leading out from this door to the sidewalk along Pinehurst Road, there is an approximately 6' by 4' stone stoop and matching path. To the right and left of the door are

symmetrical bay windows that extrude from the 39 foot wide facia facing Pinehurst. On the second floor, centered above the door and bay windows, are three smaller windows flanked by shutters. On the third floor are three dormer windows.

The north side of the Wilder home facing Murdock Road measures only 22.5 feet in width. It has a door located to the right of a brick chimney, a shuttered window to the left of the chimney, and a raised 16′ by 8′ stone porch. The door from the patio leads directly into the living room. There are no steps or path leading from the porch to the sidewalk on Murdock Road. On the second floor are two shuttered windows on either side of the chimney. On the third floor, where the pitch of the roof reduces the width of this side, two smaller and unshuttered windows flank the chimney.

The south side of the property has a door leading from the kitchen to a yard. A detached 20′ by 20′ brick garage lies between this side of the house and the alley paralleling Murdock Road. A gated wooden privacy fence extends from the corner of this face to the sidewalk on Pinehurst Road, then continues along that sidewalk to a gated masonry wall that separates the Wilder yard from the alley. Another wooden privacy fence separates the Wilder yard from the adjacent yard of appellant Jill Goldman.

The east side of the Wilder residence separates it from the Goldman residence. As noted above, however, the Wilder's east wall extends beyond the footprint of the Goldman residence.

Representing that the front yard of their home faces Pinehurst Road, the Wilders obtained a building permit to add a 13′ by 13′ one story extension to their kitchen, as well as an 8.5′ by 13′ covered porch connected to the kitchen addition, for a total expansion of 21.5′ by 13′. If the front of the Wilder home does face toward Pinehurst Road, then the kitchen addition would be in the "alley" side yard, between the house and the garage, and therefore in compliance with the 10 foot side yard setback required under Baltimore County zoning law. If the front of the Wilder home faces Murdock Road,

however, then the proposed addition would be in the rear yard, so that a variance reducing the 50 foot setback to 29 feet would be necessary.

### Neighborhood Objections

An anonymous complaint to zoning authorities asserted that the Wilder home fronts on Murdock rather than Pinehurst Road. The County inspected the property, then issued a stop work order on the ground that the Wilders' permit had been obtained through "false or misleading information" regarding the orientation of the property. The Wilders successfully challenged the stop work order, obtaining the Zoning Commissioner's ruling that their property faces Pinehurst Road.

The Protestants object that the construction of the proposed addition in the yard between the Wilder home and the alley would break up the continuity of the open yards in the rear of interior units comprising the Wilders' townhome group. When the stop work order was rescinded, the Protestants appealed to the Board.

Asserting "a public interest in the proper definition or analysis of the situation of front, side, and rear yards in a townhouse (row) setting," People's Counsel for Baltimore County also filed a hearing memorandum with the Board, but did not participate in the ensuing evidentiary hearing. Counsel urged the Board to conclude that the relevant Baltimore County zoning laws were "either ambiguous or flexible," so that "the totality of the circumstances may be taken into consideration." Using that approach, the "preliminary view" expressed by People's Counsel, premised upon an incomplete factual record, was that "the front yard should be determined to be consistent with the Murdock Road frontage of the other houses in the row."

### The Wilders' Case

At the evidentiary hearing before the Board, Mr. Wilder testified that when he first looked at the house, he was shown a brochure with a photograph featuring the Pinehurst Road side and describing the house as an "Attached Brick Center

Hall Colonial Facing Pinehurst Road." The brochure, along with exterior and interior photographs of the property, were introduced into evidence.

Wilder explained that on the Pinehurst Road side of the house are the main entrance door, doorbell, mailbox, porch light, lamppost, and a stone walkway leading from the sidewalk to the door. This door is centrally placed between two large bay windows. On the face of the house next to the door are house numbers and a welcome sign. The Wilder family and their visitors use the Pinehurst Road door exclusively for entry, mail, and deliveries.

Just inside the Pinehurst road door, the dining room is to the right of the central hallway and staircase, while the living room is to the left. Although there is a door leading from the living room out onto the stone porch facing Murdock Road, Wilder did not have a key to that door. Wilder was not aware of there ever having been a walkway from the sidewalk to the Murdock Road door or porch.

The galley style kitchen in the house has a door leading outside to a separate garage and a 15 foot wide alley. The kitchen did not provide satisfactory room for the Wilder family, which includes three school-age daughters. After visiting other homes in the neighborhood, Wilder preferred to add a breakfast room like others he saw. Wilder presented photographs of other end of group homes, depicting 13 of such homes with porches or additions in the analogous location proposed for the Wilder home. But Wilder did not know if variances were necessary or obtained for those additions.

Mrs. Wilder testified that visitors always come to the main door facing Pinehurst, where they ring the doorbell. No one has ever come to the Murdock Road door. Packages, mail, and the Rodgers Forge Community Association newsletter and correspondence are hand-delivered to that entrance as well.

The Wilders' contractor, Mr. Cooper, recounted that he reviewed a plat of the property with several people in the Zoning office, including Carl Richards, in order to discuss

what could be done. Cooper proceeded on the understanding that the addition could be built on the alley side of the house because the home faced Pinehurst Road. A building permit was issued on that basis. Construction proceeded until the stop work order was issued.

The Wilders also called Warren G. Nagey, of Chesapeake Design Group, who offered his expert opinion as an architect that the house fronts on Pinehurst. In his view, the house has two side yards and a front yard, with no back yard. He further opined that there was no other place to put an addition on the house, and that the proposed addition would not block the adjoining neighbor's residence. On cross-examination, Nagey acknowledged that the corner position of the lot means that if the Wilders wished to use the yard between their home and Murdock Road for a swing set or gazebo, that would interfere with the neighbor at 203 Murdock, whose front yard would be adjacent to such structures.

Carolyn Winston, a real property assessor with the Maryland State Department of Assessments and Taxation, reported that when she visited the Wilder house to perform a tax reassessment, she went to the main door on the Pinehurst side. Two Rodgers Forge homeowners, one of whom is a licensed real estate broker, testified that they live in similar homes. Each considered the Wilder home to front on Pinehurst Road. Neither these homeowners, nor another neighbor who lived on Murdock Road, objected to the proposed addition or felt that it would detract from neighborhood integrity or property values.

### The Protestants' Case

Joseph A. Segreti testified on behalf of the Board of Directors of the Rodgers Forge Community Association, which opposes the proposed addition. He asserted that property values in the neighborhood reflect the community's strict adherence to the Keelty Company's original concept. In his view, the Wilder addition would harm the architectural integrity of the neighborhood and reduce property values, by mixing incompatible design and materials and reducing the airflow

and sunlight through the back yards of other homes in the same housing group.

The Wilders' next door neighbor, Jill Goldman, recounted the concerns that led her to oppose the addition. Although she initially stated in writing that she agreed to the proposal, she did so in an effort to avoid conflict with the Wilders. When she discovered that the Wilders had rerouted electrical wires and attached them to the back of her house without her knowledge or consent, she changed her mind about opposing the addition. She expressed concern that the addition would block air and light into her home and decrease the value of her property.

Rodgers Forge resident Carol Zielke, a neighbor of the Wilders, testified that other end of group homes have the same floor plan as the Wilder home. She counted the number of group homes in the neighborhood and estimated that approximately one-third of all Rodgers Forge homes could be affected by a ruling that the Wilder home faces Pinehurst Road. She did not consider the size of the existing kitchen to be a hardship, pointing out that all homes in the community have had this same size kitchen for years.

Supervisor of Zoning Review Carl Richards reviews "all development proposals, permits and all information, referrals, to the zoning office." After receiving an anonymous phone call "from the community" complaining about the Wilder addition, he visited the site on his lunch hour.

Richards identified many factors that are considered in deciding where the front of a dwelling is locating. Among these are address, neighborhood design, placement of the front door, and arrangement of kitchen and bedrooms. The process by which Richards' office determines orientation includes "pretend[ ]ing" that "the building is in the center of a hundred acres." After walking "around the house," several questions arise:

> What looks like the front? Where are your accessory buildings? What really physically is the physical construction of the building? What does it look like in the front?

That's without regard to what side it faces, whether it's front or rear. So its actual physical conditions are depended on more than anything else. The intent of the owner is not as important as physical conditions.

Richards then explained why he agrees with the Protestants that the Wilder home fronts on Murdock Road. He observed that it is not uncommon to have no entrance to the front of a home in Baltimore County. Disagreeing with the Zoning Commissioner, and noting that Baltimore County zoning regulations require garages to be in the rear yard, Richards regards the detached garage as an "elephant in the living room," requiring the conclusion that the yard where the addition is proposed is the back yard of the Wilder property.

Herbert A. Davis, a realtor, appraiser, and former member of the Board of Appeals, reported his expert opinion that the Wilder home faces Murdock Road. He cited its "appearance," "address at 201 Murdock Road," and "the garage ... in the rear[,]" but acknowledged that "by definition, a center hall colonial house ... has the hall in the center," where the front door opens. He feels that the proposed addition would negatively affect the use of adjacent properties owned by Mrs. Goldman and others in the townhouse group. Moreover, by setting precedent for other similarly situated homes in Rodgers Forge, approval of the addition could have a significant negative effect on the value of other homes in the group and the greater community.

James Keelty, grandson of the original developer of Rodgers Forge and current representative of the Keelty Company, also opposed the Wilder addition. He recalled watching as a boy when common foundations were poured "more or less in a monolithic foundation." Houses, garages, and alleys were built at the same time. At the time of the hearing, moreover, the Keelty Company was in the process of building townhouse groups with "the garage ... in the front of the house" on property immediately to the north of Rodgers Forge, in a development called Rodgers Choice. Keelty testified that the County had determined that an end of group home located at

One Anvil Court in that new community, which he believes is similar to the Wilder home, faced Anvil Court.

The Protestants' final witness was Jack Dillon, who testified as an expert in land use and planning. He formerly worked for Baltimore County in that capacity. Dillon opined that the Wilder home fronts on Murdock Road. In support, he explained that townhouse groups were built to a specified design that is consistent throughout the Rodgers Forge community. Each group has continuous and common foundation walls that lie at a specific setback, with the front foundation wall running parallel to the street of its address and the rear foundation wall running parallel to the alley. Interior walls separate each unit.

Dillon construed the BCZR section 101 definition of "front yard" as "a yard extending across the full width of a lot between the front lot line and the front foundation wall of the main building" to mean that the Wilder home fronts on Murdock Road. He views this construction as consistent with the BCZR section 400.2 and 400.3 requirements governing accessory buildings such as garages, which are not permitted in side yards. Using a community map, Dillon illustrated the potential harm that a contrary ruling might have on the Rodgers Forge community, given the typicality of the Wilder home.

The Protestants also presented two memoranda from the Office of Planning to Timothy M. Kotroco, Director of the Department of Permits and Development Management, regarding the proposed addition. These reflect that County planners initially approved the Wilder addition, then opposed it, then re-approved it with conditions.[3] The later memo,

---

3. The memorandum dated December 2, 2004, authored by Pat Keller, Director of the Office of Planning, states:

After conducting a more detailed review of the subject proposal, the Office of Planning recommends that the [Wilders'] request be denied. This office is of the opinion that the ends of group units, such as the subject property, are unique. Their orientation is such that adding the proposed addition would not be appropriate or in keeping with

dated February 8, 2005, titled "2nd REVISED COMMENTS," authored by Mark A. Cunningham, and signed by Section Chief Lyn Lanham, states:

> After further review of the [Wilders'] request, and another site visit of the subject property, the Office of Planning retracts the revised comments issued by this office dated December 2, 2004.
>
> This office does not oppose the [Wilders'] request providing the following conditions are met:
>
> 1. Exterior building materials of the proposed addition shall be similar to the existing dwelling.
>
> 2. The proposed addition shall not go beyond 1 story.
>
> 3. Submit building elevations to this office for review and approval prior to the issuance of any building permits.

### The Board's Decision

The Board affirmed the Zoning Commissioner's conclusion that the Wilder residence fronts on Pinehurst Road. Acknowledging "the laudable efforts of the Rodgers Forge Community Association to maintain the architectural integrity of the neighborhood[,]" the Board pointed out that "a number of homes in Rodgers Forge, similar to that of the Wilders in the instant case, have constructed porches or additions from the side of the building where the garage is located or on the opposite side from where the garage is located." The Board agreed with People's Counsel that the orientation of the home is not defined as a matter of law:

> The Board is not inclined to rule that, as a matter of law, either Pinehurst Road or Murdock Road is the front of the property in question. The Board considers that the law is either ambiguous or flexible in this area as noted by People's Counsel in his Brief, and feels that the totality of the circumstances may be taken into consideration in this case.

---

neighborhood character, and would set a negative precedent in this older, well-established community.

The Board then considered the BCZR definition of "front yard" and the dictionary definition of "width" as "a distance from side to side; a measure taken at right angles to length; largeness or greatness in extent and girth at the widest part." It also "accept[ed] the testimony of architect Warren Nagey and the other residents" of similar end of group townhouses that certain of these corner residences in Rodgers Forge are constructed so that they face a different direction than the other units in their housing group. Collectively, the evidence and law persuaded the Board

> that the Wilders' home is fronting on Pinehurst [Road]. The widest part of the building, 39 feet, fronts on Pinehurst Road. The 22.5–foot ends facing the alley and Murdock Road do not constitute the widest part of the building. . . . [T]he main entrance to the home is through the door facing Pinehurst Road. The home is a center-hall Colonial with a center hall beginning as one enters the door facing Pinehurst Road. The Pinehurst side of the house is the most attractive with two bay windows on either side of the door. There are no structures on the front of the house facing Pinehurst to detract from it. There is a stone walkway from the sidewalk on Pinehurst to the front door and a decorative lamppost on the corner of the walk between the front walk and the Pinehurst walkway. The welcome mat is located at the door as well as the mailbox and doorbell.

> There is one door on the Murdock side of the home which goes to a stone patio. There is no walkway from the patio to the Murdock Road sidewalk, and testimony from a neighbor who has lived across the street for 43 years indicated that there never was a sidewalk from Murdock Road to the Murdock side of the Wilders' home.

> As stated by Mr. Carl Richards in his testimony on behalf of the Protestants, if the Wilder home was placed in the middle of a 100–acre field, there would be no question that the front of the home was the side of the house facing Pinehurst Road.

The Board enumerated and rejected each of the Protestants' arguments. As for the location of the garage and fences, the Board explained:

The home was constructed in the late 1930s, long before any zoning ordinances were passed with respect to the construction of garages in the rear of homes. If anything, the garage may be a nonconforming use as it is presently located. The same can be said for the 6–foot fences which separate the Wilders' home from their neighbor at 203 Murdock Road and also runs along the side of the property next to the alley off of Pinehurst.

The Board distinguished the Keelty Company's new construction in Rodgers Choice:

The main and only entrance to the home [at One Anvil Court] faced Bellona Avenue. The side of the house, determined by the County to be the front, had a built-in garage and one window—no door. However, the plan of the house showed the main entrance on Bellona Avenue and a small porch with steps going down the side of the porch toward Anvil Court. It was not clear if a path from the garage and driveway to the porch was to be constructed, but no stairs were shown to lead from the porch to Bellona Avenue. Therefore, even if the main entrance was on the Bellona Avenue side of the house, visitors and residents would normally come to the Anvil Court side of the house and go around to the Bellona Avenue entrance. The Board can understand why the County determined that the Anvil Court side of the house would be the front. This does not change the position of the Board in the instant case.

With respect to the effect of the Wilder addition on other properties in Rodgers Forge, the Board concluded "that allowing the construction ... would [not] affect the integrity of the other properties in Rodgers Forge." The "conditions set forth by the Planning Office in its February 8, 2005 memo" would be sufficient to preserve and protect other properties. Moreover, "it would be far more detrimental to find that the Pinehurst Side of the Wilder home was a side yard," because

that "would allow for an addition to be constructed within 10 feet of the property line on Pinehurst Road and would certainly have an adverse effect on the architectural integrity of the home as well as other homes in the neighborhood."

Finally, the Board concluded without discussion that it "considers that its position is consistent with its position in ... *Dorothy K. and Cheryl A. Milligan,* Case No. 02–519–A, as well as the decision of the Court of Appeals in *City of Baltimore v. Swinski,* 235 Md. 262, 263, 201 A.2d 368 (1964)."

## Judicial Review

The Protestants petitioned for judicial review by the Circuit Court for Baltimore County. The court affirmed the Board, agreeing that the orientation of the home was not purely a matter of law and finding substantial evidence to support the Board's determination that the Wilder home fronts on Pinehurst Road. Addressing the identical questions that appellants have renewed in this appeal, the circuit court held:

- The Board did not err in failing to rule as a matter of law that the Wilder property fronts on Murdock Road. The court agreed that County zoning regulations are not sufficiently definite to mandate that conclusion.

- The Board did not err in relying on the testimony of the Wilders, which was "rooted in personal knowledge and experience," and their architect, whose expertise was "accepted ... without objection by the Association." Nor were "the material facts" supporting the conclusion that Murdock Road is the front "uncontradicted in the record," as the Protestants posit. The court cited the testimony of zoning expert Jack Dillon and zoning office employee Carl Richards.... Dillon stated that the placement of an alley does not, in and of itself, determine that the alley side of a lot is in the "rear." Rather, the alley's placement "must be taken in context with other things." Dillon also testified that the placement of a garage on a property "certainly is one of the things that [the zoning office] looks at."

**634**

Carl Richards presented a series of factors that the zoning office uses to resolve which face of a building is the front. That list of factors included the location of any accessory buildings, the location of the front door, the location of the interior rooms and their orientation within the home, which side "looks to the front" if situated "in the center of a hundred acres," and the "physical construction of the building."

• The Board's decision can be reconciled with its decision in *Dorothy K. and Cheryl Milligan,* and is therefore not arbitrary and capricious. The facts surrounding the Board's determination that the Milligans' corner residence in Stoneleigh fronts on Oxford Road are similar, in that the Board considered Oxford Road to be the front due to the location of the sidewalk and main entrance to the living quarters, as well as the street address.

## DISCUSSION

The Protestants complain that the Board *"ignored* the BCZR and *ignored the uncontested and undisputed facts* before them in arriving at [its] decision." We address each of their assignments of error in turn.

### Standard Of Review

The scope of our review of administrative agency action is narrow and we are "not to substitute [our] judgment for the expertise of those persons who constitute the administrative agency." Accordingly, this Court is tasked with " 'determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' "

*Days Cove Reclamation Co. v. Queen Anne's County,* 146 Md.App. 469, 484–85, 807 A.2d 156, cert. denied, 372 Md. 431, 813 A.2d 258 (2002) (citations omitted).

"In reviewing the decision of an administrative [zoning] agency, 'we reevaluate the decision of the agency,

not the decision of the lower court.' " *Id.* at 484–85, 807 A.2d 156 (citation omitted). We may "uphold the decision of the Board only 'on the basis of the agency's reasons and findings.' " *Umerley v. People's Counsel for Baltimore County,* 108 Md.App. 497, 504, 672 A.2d 173, *cert. denied,* 342 Md. 584, 678 A.2d 1049 (1996) (citation omitted). In reviewing that rationale, "the expertise of the agency in its own field should be respected." *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169 (2001). Consequently, on "some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Id.* at 173, 783 A.2d 169. The Board's "presumed expertise in interpreting the BCZR, developed over the ... years, is what gives weight to appropriate deference in our analysis of its legal reasoning[.]" *Id.* at 173 n. 11, 783 A.2d 169.

With regard to questions of fact, we will only disturb the decision of an administrative agency if "a reasoning mind reasonably could [not] have reached the factual conclusion the agency reached." Thus, "[a] reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record."

*Days Cove Reclamation,* 146 Md.App. at 485, 807 A.2d 156.

## I.

### Orientation

#### A.

**Failure To Determine "Front Yard" As A Matter Of Law**

█ Renewing their threshold legal challenge to the Board's decision, the Protestants argue that "[t]he Board erred in failing to rule as a matter of law that Murdock Road was the front of the subject site, as required by [BCZR] § 101 defining 'front yard' and § 400.1, § 400.2 and § 400.3 defining accessory uses." In support, they cite the "undisputed" testimony of Keelty, Dillon, and Richards that the front foundation

wall for this group of townhouses is parallel to Murdock Road, as well as the County's requirement that the garage be located in the rear yard. In their view, the regulations defining front yard and requiring garages to be in the rear yard mandate a finding that the Wilder home fronts on Murdock Road.

The Wilders respond that the Board correctly concluded that yard orientation cannot be determined as a matter of law based solely on these BCZR regulations. They argue that the Board properly considered all of the evidence concerning the physical construction of the house, rather than limiting its analysis solely to the foundation and garage. We agree.

In *City of Baltimore v. Swinski,* 235 Md. 262, 265, 201 A.2d 368 (1964), the Court of Appeals addressed a comparable orientation dispute in the course of holding that the proposed apartment buildings would violate a Baltimore City zoning ordinance "requir[ing] the main entrance of a building to face the street side of a lot[.]" The *Swinski* Court interpreted analogous Baltimore City regulations[4] and followed other courts in holding that the determination of which side of a building is the "front" requires examination of the particular physical characteristics of the property in question, including the orientation of any main entrance that is both architecturally and functionally prominent:

> [W]e think it is clear that **the physical construction of a building establishes the frontage for purposes of determining whether there has been compliance with the**

---

4. The City ordinances at issue in *Swinski*

define[d] a *front yard* as the space "between the front line of the building and the front line of the lot." Ord. § 48(m); a *rear yard* as the space "between the rear line of the building and the rear line of the lot." Ord. § 48(n); and a *side yard* as the space "between the building and the side lot line." Ord. § 48(o). The *front* or *frontage* of a lot is defined as "that side of a lot abutting on a street or way and ordinarily regarded as the front of the lot, but it shall not be considered as the ordinary side of a corner lot." Ord. § 48(t). *Swinski,* 235 Md. at 264, 201 A.2d 368 (1964). *Cf. Town of Berwyn Heights v. Rogers,* 228 Md. 271, 276, 179 A.2d 712 (1962)(reviewing Prince George's County zoning ordinance with detailed provisions for building on corner lots).

zoning ordinance. In *Rhinehart v. Leitch,* 107 Conn. 400, 140 A. 763 (1928), it was said (at p. 763 of 140 A.) that:

> The word "front" as applied to a city lot has little, if any, inherent application, but it takes on a borrowed significance from the building which is or may be constructed thereon. *Connecticut Mutual Life Ins. Co. v. Ingarson,* 75 Minn. 429, 432, 78 N.W. 10; *Adams v. Howell,* 58 Misc. 435, 108 N.Y.S. 945, 947. As applied to a building "front" in general usage refers to that side of it in which is located the main entrance. *Howland v. Andrus,* 81 N.J.Eq. 175, 180, 86 A. 391; *Oxford and Standard Dictionaries,* "front." When used of a lot with a house upon it, it means that portion of the lot abutting upon the street toward which the house faces.

See also ... *Howard Homes, Inc. v. Guttman,* 190 Cal. App.2d 526, at p. 531, 12 Cal.Rptr. 244, at p. 247 (1961), where it was said that **the "front" or "face" of a house means that portion which contains the main entrance and which is the most attractive aesthetically.**

*Id.* at 264–65, 201 A.2d 368. *Cf. Bianco v. City Eng'r & Bldg. Inspector of City of North Adams,* 284 Mass. 20, 187 N.E. 101, 103 (1933)(determination of "rear lot line" was "largely a matter of fact" requiring "the exercise of sound judgment as applied to the particular neighborhood," although "partaking in some aspects of questions of law"); *Davis v. City of Abilene,* 250 S.W.2d 685, 687–88 (Tex.Civ.App.1952)(rejecting argument that building faced an alley, as an attempt to avoid 25 foot front yard setback requirement by "an unnatural construction of the side yard provision").

■ In contrast, we find no precedent for the proposition that an end of group townhouse located at the corner of two intersecting streets necessarily faces its "address" street. To be sure, the street address of a particular property is relevant to any determination of orientation. And in most instances, all units in a townhouse group will be given consecutive addresses on the same street. In the absence of any other

evidence, these two facts might be considered substantial evidence to support a finding that the corner residence fronts on the address street. But such a finding is not required in all cases. As the Court of Appeals recognized in *Swinski*, the Board may examine other relevant evidence concerning the physical characteristics of the subject property as they bear on the orientation issue.

In this case, we agree with the Board, the Wilders, and People's Counsel that, in addition to considering the location of foundation walls and the garage, the Board also properly considered other physical factors, including exterior appearance, interior layout, length of each face, and consistent use of the Pinehurst Road door as the main entrance. Moreover, we conclude that these characteristics provide substantial evidence to support the Board's factual finding that the end of group townhouse at 201 Murdock Road fronts on Pinehurst Road for purposes of determining front, side, and rear yards. As the *Swinski* Court recognized, identifying the front of a dwelling has historically and properly been accomplished by examining, *inter alia*, the aesthetics and location of the main entrance. Here, there is no debate that both the aesthetics of the house (floorplan, roofline, width, windows, etc.) as well as the location of the main entrance indicate that the house fronts on Pinehurst Road. The Murdock Road street address, the door into the living room, and the attachment of the Wilder unit to the interior units facing Murdock Road are the only contrary physical characteristics. We are not persuaded that one of the latter characteristics "trumps" other aesthetic and entrance characteristics, or that, collectively, they mandate a finding that the Murdock Road side of the house is the front yard.

Similarly, we reject the Protestants' argument that language in the BCZR definition of "front yard" and BCZR restrictions on placement of garages dispositively answers the orientation question presented by this "corner townhouse" case. Specifically, there is nothing in the garage regulation requiring us to apply that restriction as an irrebuttable pre-

sumption that a nonconforming garage, built before any restrictions on garage location went into effect, necessarily is located in the rear yard by *post hoc* virtue of said regulation. Nor do we agree that the common foundation wall reference in the definition of "front yard" aids the Protestants' cause, given that this particular end of group corner townhouse does not share either the front or the rear foundation walls that are common to the interior units in this townhouse group.[5]

We therefore hold that the Board did not err in considering physical factors other than the foundation wall and garage. The Board's examination of evidence concerning the location of the front door and front walkway, the width of the Pinehurst Road side, the floor plan and positioning of bay windows, the usage of those who live in and visit the house, and the exterior attributes of the house when viewed out of its end of group and corner context (including the roofline) was consistent with the analytical approach approved by the Court of Appeals in *Swinski.*

## B.

### Alleged Failure To Give Proper Weight To Evidence

The Protestants argue in the alternative that, even if the BCZR regulations are not dispositive, the testimony of zoning and real estate experts Dillon, Richards, and Keelty " 'trumps' the lay testimony presented by the Wilders." In support, they cite *Harford County People's Counsel v. Bel Air Realty Assocs. Ltd. P'ship*, 148 Md.App. 244, 811 A.2d 828 (2002), for the proposition that the testimony of planning and zoning experts is "entitled to more credibility based upon

---

5. As discussed above, photographs, testimony, and plans reveal that the Wilder residence does not share the common front and rear foundation walls with its interior unit neighbors in the same housing group. The common wall into which the front doors of these interior units are placed "dead ends" into the east wall of the Wilder residence, creating a 90 degree angle rather than a continuous front foundation wall. In this respect, the Wilder residence materially differs from those Rodgers Forge end units that share a common front foundation wall and substantially the same footprint as their interior unit neighbors.

long-standing administrative practice and custom" than the testimony of any witness presented by the Wilders.

The Protestants' reliance on *Bel Air Realty Assocs.* is misplaced. Our decision and rationale in that case actually supports the Board's decision in this case, because this Court relied on the local planning department's expertise in interpreting the county zoning laws as grounds to affirm its decision that a proposed commercial project was not "directly accessible" within the meaning of zoning laws restricting conventional development with open space to properties with direct ingress/egress to arterial or collector roads. *See id.* at 258–61, 811 A.2d 828. Harford County zoning authorities concluded the project was not directly accessible because it did not front on such a road, but the Board, relying on expert testimony presented by the developer, concluded there was no direct access. The circuit court reversed and this Court affirmed that decision. *See id.* at 268, 811 A.2d 828. In doing so, we observed that, "even if the phrase 'directly accessible' were ambiguous to the point of obscuring the evident meaning of the statute," nevertheless, "the administrative interpretation of the 'directly accessible' requirement" by the Department of Planning and Zoning "trumps the testimony of Bel Air Realty's experts and its interpretation to the contrary." *Id.* at 267, 811 A.2d 828. Citing established reasons for judicial deference to an agency's expertise in interpreting a statute that it is charged with enforcing, we were "convinced that the Department's interpretation is a persuasive articulation of the 'directly accessible' language of" the zoning statute. *See id.* at 267–68, 811 A.2d 828.

The Protestants misunderstand our "trumping" language in *Bel Air Realty* as an instruction to defer to *any* zoning expert's opinion regarding the meaning and application of a zoning statute, regardless of whether the Baltimore County Department of Permits and Management and the Board concur with that opinion. To the contrary, *Bel Air Realty* merely confirms that courts appropriately defer to a local zoning agency's expertise in interpreting the zoning

regulations it administers, as occurred in this case. Accordingly, we conclude that the Board did not err in failing to give dispositive weight to the opinions expressed by the Protestants' zoning experts.

## II.

### Testimony Of Wilders' Architectural Expert

■ Despite the substantial evidence in the record to support the Board's determination that the Wilder home faces Pinehurst, the Protestants contend that "uncontradicted" material facts establish that Murdock Road is the front of the Wilder home, because "the Board erred in not disregarding the speculative testimony of the Wilders and their architectural expert Warren G. Nagey of Chesapeake Design Group." They analogize this case to *Lewis v. Dep't of Natural Resources,* 377 Md. 382, 429–30, 833 A.2d 563 (2003), in which the Court of Appeals concluded, *inter alia,* that the expert who testified on behalf of the local agency had no empirical data to support her conclusions. In the Protestants' view, the two cases are similar because the only expert evidence the Board had was favorable to a finding that the Wilder home fronts on Murdock, *i.e.,* that "there was a common front foundation wall on Murdock Road as evidenced by the Keelty and Dillon testimony and that the garage was located in the rear yard in compliance with the BCZR § 400 as again articulated by Dillon and Richards[.]"

■ We are not persuaded by this argument. As a threshold matter, the Protestants did not object to the testimony of Mr. Nagey, and therefore waived their objection to the Board's consideration of it. Moreover, as discussed in section I, neither the garage location nor the foundation wall requires acceptance of the Protestants' argument. We conclude that Nagey's opinion that, from an architectural perspective, the Wilder home fronts on Pinehurst, was supported by ample factual evidence, as enumerated above with respect to the location of the main entrance, as well as its exterior appearance and interior floor plan. In this respect, this case

stands in stark contrast to *Lewis*, in which the agency's expert had no factual data to support her opinion.[6]

## III.

### Consistency With Prior Decision

 In their final assignment of error, the Protestants argue that "[t] he Board was arbitrary and capricious in ignoring its opposite conclusion in [the] previous case [of] *Dorothy K. and Cheryl A. Milligan*, Case No. 02–519–A." They contend that the Board's decision in *Milligan*, that a Stoneleigh residence located at the corner of Oxford and Hatherleigh Roads faces Oxford Road, is irreconcilably inconsistent with its decision that the Wilder home does not front on its address street, Murdock Road. *See, e.g., Aspen Hill Venture v. Montgomery County*, 265 Md. 303, 289 A.2d 303 (1972)(reaching opposite conclusion in substantively similar cases may constitute "arbitrary, capricious and discriminatory" decision). The Wilders respond that the *Milligan* decision "is completely distinguishable," as the Board recognized.

Ms. Milligan sought a variance for a 20′ by 12′ art studio that she built as an accessory structure. On corner lots such as Milligan's, such structures must be located in the rear third of the yard. *See* BCZR § 400.1. Milligan argued that she had complied with that requirement because her house fronted on Oxford Road, where her mail is addressed and delivered. Although the house has an enclosed porch with an exterior door on the Oxford Road side, the main entry door and driveway are on the Hatherleigh Road side, which is also the longer side of the house. Both the Stoneleigh Community Association and the Rodgers Forge Community Association

---

6. In *Lewis*, the Court of Appeals held that the decision to deny a special exception for hunting cabins had been "improperly influenced by the [Chesapeake Bay] Commission's expert, Ms. Chandler," who admitted on cross-examination that she did not have an environmental study or any other quantifiable data to support her opinion that the "cumulative impacts" of the proposed cabins on the estuary island environment justified denial of a special exception. *See Lewis v. Dep't of Natural Resources*, 377 Md. 382, 429–31, 833 A.2d 563 (2003).

opposed the variance, expressing concerns about its immediate and precedential impact for other corner lots.

A majority of the Board found "as a matter of fact that the Petitioner has offered convincing and substantial evidence that the accessory structure has been constructed in the rear third of the lot" as required. It cited "several reasons" as follows:

First the one and only address given to the subject site is 7116 Oxford Road. This side of the house has a sidewalk and an entrance into the main living quarters. **This is the address and entrance where the mail and other deliveries are directed.**

Secondly the plat shows clearly that **the setback from Oxford Road is 25 feet, a "front yard setback"** whereas the setback from the adjacent lot at 7112 and from Hatherleigh Road on the other side is a 10–foot "side yard" setback.

Thirdly, all services to the subject site including utility poles and lines come in from Hatherleigh Road. We find this to be typical of subdivisions that such services and **utilities are not placed in the front of the house.**

Finally the evidence and testimony presented is uncontradicted that from York Road into the subdivision all corner lot houses have entrances fronting on the intersecting side streets with driveways off Hatherleigh Road. **Only two houses, those of Ms. Milligan and Mr. Gill, also have entrances that face Hatherleigh.** As Mr. Gill, a Protestant, testified, having two entrances does cause some confusion.

Accepted by the Board as an expert in architecture and urban design, we found the testimony of Mr. Hill to be persuasive. Mr. Hill noted that "attractive facades" was typical of the design attributes when Stoneleigh was constructed. . . .

The majority did not find compelling the testimony of Mr. Thompson of PDM that his department determines the front of a property from its physical characteristics and using common sense. Similarly **Mr. Thompson produced**

no evidence to support his opinion that the subject property would be given an address on Hatherleigh Road if it were to be built today.

We do not find the Board's decision in this case to be inconsistent with its decision in *Milligan*. Although both decisions concern corner lots, the Stoneleigh case involved a separate accessory structure for a single family home, rather than an addition to a townhouse end unit. Most importantly, in both cases, the Board cited the factors of mail and package delivery as evidence that supported its orientation decision. Similarly, in both cases, the Board relied on architectural expert opinion that it found persuasive.

One material difference between the decisions in *Milligan* and *Wilder* is that the 25' setback applicable to the Milligan house strongly supported the Board's conclusion that the house fronted on Oxford Road, whereas there is no evidence of a comparably "telltale" setback differential that could help identify the front and side yards of the Wilder home.[7] The most significant distinction between the two residences is that the Milligan house has a commonly used path from the sidewalk to its Oxford Road door, which is used for mail and package delivery, whereas there is no path from Murdock Road to the Wilder townhome and only the Pinehurst Road door is used for entry, mail, and deliveries.[8] In these circumstances, the Board's decision that the Wilder home fronts on

---

7. The front and side yard setbacks for the Wilder home in Rodgers Forge are both ten feet. According to the Protestants, if the Wilder residence fronts on Murdock Road, as they contend it should, there would be no setback obstacle to an addition on the Pinehurst Road side, although Rodgers Forge homeowners "would probably object ... from a covenant standpoint," based on Rodgers Forge covenants that "privately adjust and determine what could be done and what can't be done[.]" We have not been directed to any such covenants in the record before us.

8. Although the Board explicitly criticized the County zoning authority's reliance on physical characteristics of the property and "common sense" to justify the decision in *Milligan,* we regard this statement in context as merely disapproving the County's effort to use undefined "common sense" rather than duly enacted BCZR benchmarks such as setback distances.

Pinehurst Road is not inconsistent with its decision that the Milligan home fronts on Oxford Road.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**